IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 1:10-CR-053-CAP-ECS-1 |
| | : | |
| CORNELL BRUMFIELD | : | |

**REPORT AND RECOMMENDATION**

**I.**
**The Motion to Suppress**

This matter is before the Court on Defendant's motion to suppress. [Doc. 32]. An evidentiary hearing was held on July 8, 2010. [Doc. 49].[1]  All briefs have been filed. The motion is now ready for issuance of a Report and Recommendation.

The motion seeks to suppress evidence seized after Defendant's car was stopped and impounded on January 4, 2010, in connection with the robbery of a Regions Bank located on Concord Road in Smyrna, Georgia.  Defendant contends that the officers lacked probable cause or reasonable suspicion to make the stop and that impounding and later searching the vehicle at the impound lot was illegal. Defendant also contends that statements he made at the Smyrna Police Department after the stop and impound were un-Mirandized[2] and involuntary.

---

[1] References to the transcript of the July 8, 2010, evidentiary hearing will be cited as "(T. pg)."

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

AO 72A
(Rev.8/82)

## II.
## **Factual Background**

On the morning of January 14, 2010, the Regions Bank located on Concord Road in Smyrna, Georgia, was robbed by a lone robber who escaped carrying the stolen currency in a dark colored duffel-type bag. The suspected robber was observed running in an "all-out sprint" from the bank – carrying the duffel bag – by Matthew Justice, a groundskeeper working outside the Brown Elementary School located across Brown Road behind and near the Regions Bank. (T. 7-8). The witness also noticed evidence that a dye pack had exploded: "So when he was coming back up across [the parking lot], then there seemed to be a little pinkish-maroon cloud." (T. 8). Mr. Justice crossed Brown Road to see where the running man was headed but lost sight of him as the man went down a hill behind the bank and toward a parking lot. (T. 9). By the time the groundskeeper got across the road, the running man had disappeared. (T. 9). Instead, the groundskeeper observed another man, later identified as the Defendant, near the trunk of a gray or silver Dodge Stratus pulling a paper covering off the license tag of the vehicle. (T. 9-10). This man got in the Dodge Stratus and drove off down Brown Road and turned left on South Cobb Drive. (T. 11).

About this time, a Smyrna police car came up South Cobb Drive and into the bank parking lot and was flagged down by Mr. Justice,

AO 72A
(Rev.8/82)

who told him about seeing the running man and about the gray Dodge that had pulled away and onto South Cobb Drive. (T. 11-12). According to Mr. Justice, this officer spoke on his radio and then went "tear[ing] off down Brown Road." (T. 11-12). The officer observed by Mr. Justice was apparently Officer Nesbit, who broadcast the initial report to be on the lookout for a gray Dodge Stratus. (T. 100-101).

Meanwhile, Officer Reginald Davis of the Smyrna Police Department had responded to the robbery in progress announcement that was broadcast on his radio. (T. 32). He headed south on South Cobb and spotted the Defendant's vehicle, which matched the description broadcast to him. (T. 33). He followed the car for a distance, waiting for backup, and then pulled it over. (T. 33-34). Backup arrived and Defendant was ordered out of the vehicle at gunpoint and handcuffed. (T. 35, 56). After the vehicle was inspected for other occupants, and Defendant's three-year-old daughter was discovered in the backseat, Defendant's handcuffs were removed. (T. 37). During this time the Defendant denied any knowledge of the robbery.[3] (T. 37).

---

[3] Defendant's three-year-old daughter was asked where she and her "Daddy" had come from and she pointed back towards the bank. When she was asked if they had been to the bank, she answered in the affirmative. (T. 89).

Defendant produced his driver's license. (T. 38). A computer check of the vehicle tag disclosed a suspended registration and no valid insurance. (T. 38). The officers then issued a citation under O.C.G.A. § 40-6-10 and impounded the car under the City of Smyrna impound policy. (T. 38), [Gov. Exhs. 3, 5]. After looking inside the passenger compartment of the vehicle and taking an inventory, the officers arranged for the car to be towed. (T. 46). The officers could not get into the trunk at this time, however. (T. 45). Defendant said the trunk was broken. (T. 37, 90). Defendant was also asked if he was willing to come down to the police department and he agreed. (T. 41).

While all this was going on, Officer Edward Cason, who was back at the bank, took a statement from Mr. Justice. Officer Carson relayed the information obtained from Mr. Justice to the officers on the road. (T. 19-20). By this time the officers had already stopped Defendant's car. (T. 20).

One of the officers at the stop, Officer Maroney, left the scene of the stop and came back to the bank to speak to the detectives and gather further information. (T. 90-91). During this time he walked around the bank and found two one-hundred dollar bills with red stain on them on the hill behind the bank leading down to the Kroger parking lot. (T. 91-92).

4

The Dodge Stratus was towed on a flatbed tow truck by Daniel Herbert of Howard Trucker Service to the impound lot at the Smyrna Police Department, about six miles from the scene of the stop. (T. 72-73). When he arrived at the impound lot, Mr. Herbert began the process of offloading the Stratus from the flatbed. (T. 73). As Mr. Herbert came around the rear of his tow truck to prepare the car to be taken off, he was startled and surprised to find a man with a duffel bag crouching in the truck bed near the rear door of the Stratus, which was slightly ajar. (T.73-74). Herbert confronted the man, who said he was "passing through," after which the man jumped down off the truck and made a quick getaway. (T. 73-74). Mr. Herbert called 911 and made a report, but the man got away. (T. 74).

Upon further investigation by the Smyrna Police Department it appeared that the man had been hiding in the trunk of the Stratus and had gotten out of the trunk by pushing out the backseat and exiting the rear door. (93-94). When the officers looked into the vehicle at the impound lot, they saw the seat pushed forward and a large plastic bag inside the trunk. (T. 94). Officer Maroney then opened the trunk by using the trunk release on the Defendant's keys and found various items of possible evidence: gloves, a walkie-talkie, a pistol, and electrical cord. (T. 94, 97). After this initial search at the impound lot the vehicle was secured and a

5

search warrant was obtained permitting a further search of the vehicle. See [Gov. Exh. 20]; (T. 111). The seized items were inventoried after execution of the search warrant. (T. 112).

Meanwhile, at the station, Defendant was questioned by Detective Harrison in an interview room. (T. 113-115). Defendant's daughter was with him during the interview. (T. 121-122). Detective Harrison asked Defendant a couple of questions at the outset about where he had been coming from and whether he had a criminal record. (T. 116) This was prior to any Miranda warnings being given. (T. 116). He then administered Miranda warnings and questioned Defendant at greater length. See [Gov. Exh. 22]; (T. 113-115).

## III.
## Discussion

### A. The Stop of the Vehicle

Defendant argues that the officers who stopped his car on South Cobb Drive lacked reasonable suspicion for the initial stop of his vehicle. [Doc. 53, at 9]. In essence, Defendant argues that the stop was based purely on a mere hunch or generalized suspicion insufficient to justify it. [Id.]

The Constitution permits police officers to conduct a brief investigatory stop, Terry v. Ohio, 392 U.S. 1, 24-27 (1968), "if they have a reasonable, articulable suspicion based on objective

6

facts" that an individual is engaged in criminal activity. United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000).  The "reasonable suspicion" must be more than an "inchoate and unparticularized suspicion or hunch." Terry, 392 U.S. at 27.  The officer must have "some minimal level of objective justification" taken from the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 7 (1989) (citing INS v. Delgado, 466 U.S. 210, 217 (1984)).  A finding of reasonable suspicion "does not require officers to catch the suspect in a crime.  Instead, [a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008)(quoting United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004)). "Reasonable suspicion" is a less demanding standard than probable cause and requires "considerably less" than a preponderance of the evidence. Sokolow, 490 U.S. at 7.

The officers in this case were possessed of reasonable suspicion sufficient to justify the stop of Defendant's vehicle. An armed bank robbery had been reported to have occurred at the Regions Bank at about 11:34 that morning.  Mr. Justice, the groundskeeper, also had reported to Officer Nesbit, who arrived first on the scene, that he had seen a man running away from the bank down the hill in the direction of the Kroger parking lot, carrying a duffel bag and accompanied by a pinkish-maroon cloud.  (T. 8, 100-101).  Further,

7

the witness had also reported that he believed that the robber had gotten into the gray Dodge that had been parked behind the bank in the Kroger parking lot and that the vehicle had left the parking lot on Brown Road and turned left onto South Cobb Drive. (T. 12). The vehicle was definitely identified as a Dodge, more specifically as a Dodge Stratus. (T. 12, 16, 21, 32, 51, 85).

After being advised to be on the lookout for a Dodge Stratus, Officer Davis saw a Dodge Stratus on South Cobb Drive, heading away from the Regions Bank, and made the stop. (T. 32-33, 85). This sighting was within a few minutes of the bank robbery report; the vehicle stop occurred shortly thereafter. (T. 33). Considering all the above facts in their totality, the circumstances were sufficient to justify Officer Davis in making a Terry stop to investigate whether Defendant's Dodge Stratus was the same Dodge Stratus that had been seen behind the bank at the time of the robbery.[4]

---

[4] Officer Cason testified that by the time he interviewed the groundskeeper, Mr. Justice, about what he saw and called it in, he thought the officers had already stopped the Dodge. (T. 19-21). Officer Davis also recollected that the description of the car must have come from Officer Cason. (T.32). Sergeant Maroney, however, testified that Corporal Nesbitt arrived first and was the officer who was flagged down by the groundskeeper and broadcasted the description. (T. 100-102). This would have been before Officer Cason came a few minutes later and took a statement from Mr. Justice, the groundskeeper, (T. 19), and would explain any issue as to whether Officer Davis had received the description of the gray or silver Dodge Stratus before he made the stop.

**B. The Search of the Vehicle**

Defendant contends that the search of the vehicle in the impound lot was illegal.[5] Defendant contends that the search was per se illegal because it was warrantless, arguing that the search cannot be justified as a protective sweep. [Doc. 59, at 11]. The government responds that even if the search could not be justified as a protective sweep, the officers had probable cause to believe that the vehicle contained evidence relating to the bank robbery and that the search was justified under the automobile exception to the exclusionary rule.[6] [Doc. 64, at 15].

The "automobile exception" to the warrant requirement provides that, when there is probable cause to believe that contraband or evidence of a crime is in a vehicle, the vehicle may be searched without a warrant. Chambers v. Maroney, 399 U.S. 42, 48, 90 S.Ct. 1975 (1970). The initial justification for this exception was based upon the exigent circumstances related to the movability of the vehicle. Id. at 51. The Supreme Court has subsequently made clear that if there is probable cause to search a vehicle, and the vehicle

---

[5] No challenge to the initial search of the car on the scene or to the validity of the impoundment (or the inventory) is raised by Defendant.

[6] Likewise, defendant makes no attack on the validity of the warrant that was later issued except, implicitly, insofar as it may have been dependent upon the legality of the initial search in the impound lot.

9

is readily mobile, the Fourth Amendment permits the police to search the vehicle without more. Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485 (1996) (citing California v. Carney, 471 U.S. 386, 393 (1985)). No special exigency is required beyond a showing of the mobility of the vehicle. See Maryland v. Dyson, 527 U.S. 465, 466-67, 119 S.Ct. 2013 (1999) (per curiam). In short, as stated by the Eleventh Circuit in United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003):

> [T]here are only two questions that must be answered in the affirmative before authorities may conduct a warrantless search of an automobile. The first is whether the automobile is readily mobile. All that is necessary to satisfy this element is that the automobile is operational. . . . The second prong of the test, probable cause, is determined under the facts of each case.

In this case, the automobile exception validates the warrantless entry of the vehicle in the impound lot. As for the first question, it is undisputed that the vehicle was operational and readily mobile when it was impounded and taken to the impound lot. Once law enforcement officers have probable cause to conduct a warrantless search of an operational vehicle, the officers may conduct the warrantless search even after the vehicle is impounded and in police custody. See Chambers v. Maroney, 399 U.S. 42, 50-52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Michigan v. Thomas, 458 U.S. 259, 261, 102 S.Ct. 3079, 3080-81, 73 L.Ed.2d 750 (1982). It makes no difference that at the time the vehicle was searched it had been

10

impounded or that there were no exigent circumstances necessitating a warrantless search. "[T]here is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure or that other exigent circumstances exist." United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007); Watts, 329 F.3d 1285-1286 (11th Cir. 2003). In the present case, the vehicle was lawfully seized when it was impounded. Chambers, 399 U.S. at 50-52.

As for the second prong, the officers had probable cause to search the vehicle at the impound lot. The circumstances that led to the identification and stop of the Dodge, and its connection to the fleeing bank robber with the duffel bag, are recited above and need not be repeated. Even assuming, *arguendo*, that probable cause might have been lacking to search at the time of the initial stop, once the mystery man with the duffel bag appeared on the flatbed of the tow truck at the impound lot, what was reasonable suspicion certainly ripened into probable cause. And the vehicle was still movable and operational.

Accordingly, the search of the vehicle at the impound lot should be sustained.

**C. Defendant's Custodial Statement**

Defendant contends that all pre-Miranda statements he made, at both the time of the stop and later at the police station, should be

11

suppressed as involuntary and in violation of Miranda. The government responds that Defendant was not "in custody" after the initial stop and therefore Miranda warnings were not required at this time. As for the statements made at the station, the government asserts that Miranda warnings were administered in a timely manner and that Defendant's post-Miranda statements were voluntary, even though defendant was asked "a couple of questions" at the station before the warnings were given.

Under Miranda v. Arizona, 385 U.S. 436 (1966), before questioning a suspect in custody, law enforcement must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney during questioning, and that, if he cannot afford an attorney, one will be appointed for him. 384 U.S. at 467-73. Miranda rights may be waived, however, id. at 475; and, even if Miranda warnings are given, evidence that is coerced must be excluded. Colorado v. Connelly, 479 U.S. 157, 167 (1986) (dictum). In general, the government must prove that the defendant voluntarily, knowingly, and intelligently waived his or her Miranda rights. Miranda, 384 U.S. at 475.

> The inquiry [into waiver] has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with

12

>    a full awareness of both the nature of the right being
>    abandoned and the consequences of the decision to abandon
>    it.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (internal citations omitted). The government bears the burden of proving waiver by at least a preponderance of the evidence. Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004); Connelly, 479 U.S. at 169.

**1. Roadside Questioning**

First, with respect to the questioning by the side of the road, it does not appear that Defendant was "in custody" such that Miranda warnings were required. Although Defendant had undisputedly been detained when the initial stop was made and was not free to leave, he had been released from the handcuffs and was seated or standing by the side of a busy public road when he was questioned. (T. 37). The weapons that had initially been drawn when he stepped out of the car had been re-holstered. (T. 36). By the time he was questioned, the situation had become significantly less threatening than when it was initiated.

Custody for Miranda purposes generally involves deprivation of freedom of action "in any significant way," Miranda at 444, as measured objectively from the perspective of a reasonable person. Berkimer v. McCarty, 468 U.S. 420, 442 (1984).[7] "And, under the

---

[7] The standard has also been stated as whether "there is a 'formal arrest or restraint on freedom of movement' of the degree

13

objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) (citing Florida v. Bostick, 501 U.S. 429, 437-38 (1991)).

In this case, Defendant's vehicle was pulled over for investigative purposes based on reasonable suspicion that the vehicle was associated with a bank robbery. In other words, this was a Terry stop,[8] and the Supreme Court and the Eleventh Circuit have applied a less literal standard for determining whether Terry-stop questioning is custodial in the traffic stop context. Thus, the Supreme Court has recently reiterated that "the temporary and relatively nonthreatening detention involved in a traffic stop or Terry stop does not constitute Miranda custody." Maryland v. Shatzer, 130 S.Ct. 1213, 1224 (2010)(citations omitted).

In drawing the line between a non-custodial Terry inquiry that does not require Miranda warnings and a custodial arrest which does, several factors are informative: "the law enforcement purposes served by the detention; the diligence with which the police pursue the investigation; the scope and intrusiveness of the detention; and

---

associated with formal arrest." New York v. Quarles, 467 U.S. 649, 655 (1989); United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000)(quoting Minnesota v. Murphy, 465 U.S. 420, 430 (1984)).

[8] Terry v. Ohio, 392 U.S. 1, 24-27 (1968).

14

the duration of the detention." United States v. Acosta, 363 F.3d 1141, 1146 (11th Cir. 2004) (quoting United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000)); see also United States v. Williams, 238 Fed. Appx. 566, 568 (11th Cir. 2007). In this case, the police detained Defendant to pursue investigation of a recently committed armed bank robbery in a manner likely to confirm or dispel their suspicions quickly, and with a minimum of interference with Defendant. They stopped the car, removed Defendant, looked inside the car, asked Defendant if he knew anything about the robbery, and ran the license tag on the car. All of this was done diligently and without delay or undue intrusiveness. The duration was not extended, and after the investigation was completed the vehicle was validly impounded and Defendant agreed to come down to the station.

Despite its coercive aspects at the outset, this case falls into the category of a relatively non-threatening detention situation that does not amount to custody for purposes of Miranda. By the time Defendant's handcuffs had been removed and the guns holstered, the coerciveness of this public encounter had diminished to the extent that a reasonable innocent person would not have felt that he was under arrest or that this encounter would be anything but temporary, unless voluntarily extended.

15

Under the circumstances, Defendant's detention did not mature into a custodial arrest, <u>Miranda</u> warnings were not required roadside, and any statements Defendant made should be admissible.

**2. The Station-House Interview**

After Defendant was detained by the side of the road and his car impounded due to the suspended license tag, Defendant agreed to go to the station-house to answer some questions. At the station, Detective Harrison asked him a couple of questions about where he had been coming from and his criminal record before he advised him of his <u>Miranda</u> rights. Having been advised of his rights, Defendant proceeded to talk with the Detective and answered questions. (T. 113); <u>see</u> [Gov. Exh. 22].

Defendant contends that the <u>Miranda</u> warnings were given too late and that Defendant's statements were involuntary. The evidence does not, however, support a finding that Defendant's statements were involuntary or that his waiver of his <u>Miranda</u> rights was not knowing, intelligent and voluntary. The record shows that Defendant agreed to come to the station. He was placed in an interview room and was not separated from his daughter, who sat on his lap during the interview. He was not handcuffed, nor were any weapons displayed, and the manner of questioning was not coercive. A review of the audio tape of the interview confirms the administration of the <u>Miranda</u> warnings and Defendant's acknowledgment that he

understood them.  [Gov. Exh. 22].  The tape discloses no overreaching by Detective Harrison or undue pressure on Defendant to answer the questions.

Upon consideration of the above facts, the undersigned finds that Defendant came voluntarily to the station and was not "in custody" when he made his statements.  See California v. Beheler, 463 US 1121, 1125 (1983) ("Miranda warnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."). Furthermore, his statements were voluntary.  As for his pre-Miranda answers to the two questions, these answers are admissible because Miranda warnings are not required to be given to one not in custody. And his post-Miranda statements are a fortiorari also admissible because they were voluntary - his Miranda rights were waived and he agreed to speak - even if he were deemed to have been in custody. Finally, There is no issue relating to dual questioning under Missouri v. Seibert, 542 U.S. 600 (2004).[9]  In sum, the motion to suppress statements should be **DENIED**.

---

[9] Defendant did not cite Siebert or explicitly raise an issue under Siebert but, in any event, the facts do not support a finding that Defendant's Mirandized statement was tainted by his un-Mirandized statement because, among other things, Defendant was not in custody when he gave it, nor was any deliberate two-step "question first" strategy employed to obtain a confession as prohibited in Seibert.  542 U.S. at 610.

## IV.
## Conclusion

In conclusion, the undersigned **RECOMMENDS** that Defendants motion to suppress evidence and statements be **DENIED**.

**SO REPORTED AND RECOMMENDED**, this 17th day of February, 2011.

*/s/ E.Clayton Scofield III*
E. Clayton Scofield III
United States Magistrate Judge